IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

GERARDO OLIVERAS ZAPATA,

     Plaintiff,

     v.

UNIVISION PUERTO RICO, INC.,

     Defendant.

CIVIL NO. 09-1987 (BJM)

## OPINION AND ORDER

Gerardo Oliveras Zapata ("Oliveras") sued Univision Puerto Rico, Inc. ("Univision") alleging employment discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; unlawful employment practices under  Law No. 69 of July 6, 1985, 29 L.P.R.A. §§ 1321 *et seq.*; employment discrimination under Law No. 100 of June 30, 1959 ("Law 100"), 29 L.P.R.A. §§ 146 *et seq.*; employment retaliation under Law No. 115 of December 20, 1991 ("Law 115"), 29 L.P.R.A. §§ 194 *et seq.*; and wrongful discharge under Law No. 80 of May 30, 1976 ("Law 80"), 29 L.P.R.A. §§ 185a *et seq.* (Docket No. 16).  This case is before me on the consent of the parties. (Docket No. 17).  Before the court is Univision's motion for summary judgment (Docket No. 26).  Oliveras opposed (Docket No. 54), Univision replied (Docket No. 68), and Oliveras filed a sur-reply (Docket No. 89).  Also before the court are Oliveras's motion to strike portions of Univison's exhibits (Docket No. 53) and Univision's motion to strike one of Oliveras's exhibits (Docket No. 65).  These motions to strike are granted in part to the extent discussed herein, and otherwise denied.  For the reasons that follow, Univision's motion for summary judgment is **granted in part and denied in part**.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of the case are summarized below after applying Local Rule 56, which structures the presentation of proof in the summary judgment context.  The rule "relieve[s] the district court

of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," <u>CMI Capital Market Inv. v. González-Toro</u>, 520 F.3d 58, 62 (1st Cir. 2008), and prevents parties from "improperly shift[ing] the burden of organizing the evidence presented in a given case to the district court." <u>Mariani-Colón v. Dep't of Homeland Sec.</u>, 511 F.3d 216, 219 (1st Cir. 2007). The court has no duty to "independently search or consider any part of the record not specifically referenced in the parties' separate statement[s] of facts." Local Rule 56(e).[1]

### Univision and its employees

Univision is a telecommunications company that, among other operations, broadcasts television programs in Spanish, produces program content, obtains advertisers, and promotes the station and its shows. (Docket No. 27, Statement of Uncontested Material Facts, hereinafter "SUMF", ¶ 1). Univision has 233 employees. (SUMF, ¶ 2). Larry Sands ("Sands") is the President and General Manager of Univision. (SUMF, ¶ 5). Sands is the highest ranking officer at Univision. (SUMF, ¶ 152). Sands was Oliveras's immediate supervisor at the time Oliveras was hired. (SUMF, ¶ 9). Sands recruited and hired Oliveras to work for Univision. (SUMF, ¶ 6).

### Oliveras's contract and original job

Oliveras was hired on May 10, 2004 as Director of the Promotions Department for Univision. (SUMF, ¶ 3). Oliveras's previous position was working for Telemundo in Miami, Florida for 13 years. (SUMF, ¶ 4). He was 43 years old when he was hired. (SUMF, ¶ 6). His employment agreement, signed May 10, 2004, provided for a three-year contract, ending May 9, 2007. (SUMF, ¶ 7). The contract states it is to be governed by and construed in accordance with the laws of Puerto Rico. (Docket No. 58-2, p. 12). The contract permitted Univision to terminate Oliveras's

---

[1] A motion for summary judgment must be supported by "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." Local Rule 56(b). The party opposing a motion for summary judgment must admit, deny, or qualify the moving party's facts by reference to each numbered paragraph, and may make an opposing statement of material facts. Local Rule 56(c). Finally, a party replying to the opposition to a motion for summary judgment must admit, deny, or qualify the non-movant's facts, again in a separate statement and by reference to each numbered paragraph, Local Rule 56(d), and any of either party's facts not properly controverted as described by the rule is deemed admitted. Local Rule 56(e). All facts must be supported by citation to record evidence, else they are ignored. Local Rule 56.

employment with cause and without notice.  (Docket No. 58, Plaintiff's Additional Relevant Facts, hereinafter "PARF", ¶ 3).  The contract states Univision had an option to extend the employment agreement for additional one-year terms starting May 10, 2005 and May 10, 2006, and that the extensions would occur unless Univision gave twenty-eight days' notice to Oliveras.  (Docket No. 58-2, p. 1–2).  Oliveras's compensation was set at $75,000 annualized base pay for the first year, $80,000 annualized base pay for the year starting May 10, 2005, and $85,000 annualized base pay for the year starting May 10, 2006.  (SUMF, ¶¶ 7–8).  The compensation clause states that pay is "[o]n the condition that Employee shall have kept and performed all duties and obligations of Employee hereunder."  (Docket No. 58-2, p. 2).  This compensation structure was determined by Sands.  (SUMF, ¶ 8).

Oliveras's original responsibilities as Director were to ensure the correct promotion of the station's properties, with an eye to execution and quality; supervise Promotion Producers and the quality of their work; schedule promotions and properties on the station's "programming log"; submit the logs to Univision's Traffic Department; and be a contact between Univision and its ad agency, Young & Rubicam.  (SUMF, ¶¶ 12, 13).

The Promotions Department's responsibilities include launching *novelas*, "Jingles," promoting ongoing programming and news, scheduling of promotions in the programming log, working with Univision's advertising agency, and preparing "Up Front Presentations."  (SUMF, ¶ 11).  The programming log is a daily schedule of the station's programming, including shows, promotions, commercials, and public service announcements.  (SUMF, ¶ 14).  A "*novela* launch" is the promotional campaign preceding the first air-date of a *novela*, intended to inform viewers of the upcoming series and increase viewership.  (SUMF, ¶ 20).  These launches are especially important when a competing station also launches a *novela* in the same time slot, as the stations compete for the same viewers.  (SUMF, ¶ 21).  Because most *novelas* air five days a week, including up to three prime-time slots, they have a large impact on Univision's ratings.  (SUMF, ¶ 24).

When Oliveras was hired he oversaw four Promotion Producers: Luani Pellot ("Pellot"), Susan Pagán ("Pagán"), Tomás Colón ("Colón"), and Yadira Tanco ("Tanco"). (SUMF, ¶ 18). The producers were assigned specific properties or shows to promote. (Id.).

On April 16, 2005, Oliveras received the Univision Television Group Promo Award, a recognition award, from John Lippman ("Lippman"), the Vice President of News and Operations of Univision Television Group, Inc. (PARF, ¶ 5). Lippman also gave Oliveras the Golden Tulip Broach, as a recognition of his performance as Director of the Promotions Department. (Id.).

### *Changes following Jessica Rodríguez's promotion*

Jessica Rodríguez ("Rodríguez") was Programming Director of Univision at the time Oliveras was hired; she was named Station Manager in early 2005, at which point she became Oliveras's immediate supervisor. (SUMF, ¶ 9). Her Programming Director duties included overseeing programming, promotions, and the Traffic Department, as well as purchasing programming, scheduling programs, stunting programs, and being in charge of the promotional activity that goes along with the station's programs. (SUMF, ¶ 33). Her Station Manager duties entailed overseeing all operations of the station, including news, production, traffic, programming, promotions, risk management, and community affairs. (SUMF ¶ 32). As Station Manager, Rodríguez revised everything meant to go on the air, and constantly watched Univision's programming. (SUMF, ¶¶ 30, 31).

Oliveras's compensation increased to $80,000 base pay for the year starting May 10, 2005. (SUMF, ¶¶ 7–8).

In late 2005, Rodríguez held weekly meetings with the Promotions Department. (SUMF, ¶ 26). At the meetings, Rodríguez and the Promotions Team would review the station's product list, and review and make plans for the department. (SUMF, ¶ 27). Participants each had an opportunity to talk and suggest strategies for promoting their assigned properties. (Id.). Oliveras's role with respect to proposing the station's strategic direction changed because Rodríguez began giving

directions to the Promotions Department at these meetings.  (SUMF, ¶ 25).  Oliveras participated

in these meetings less than he had before because Rodríguez was giving him instructions.  (SUMF,

¶ 29).

On August 1, 2005, Rodríguez e-mailed Oliveras regarding the airing of a promo featuring

actress Adamaris López, depicting her jumping up and down; at the time the promo aired, López was

undergoing chemotherapy treatment.  (SUMF, ¶ 34).  In her statement under penalty of perjury,

Rodríguez said she considered this poor judgment and a "lack of sensibility" on Oliveras's part.

(Id.).

### *January–September 2006: "Alborada" and other promotions*

On November 9, 2005, Rodríguez informed Oliveras that the *novela* "Alborada" would be

launched at the 8:00 p.m. time slot.  (SUMF, ¶ 35).  On January 15, 2006, Rodríguez e-mailed

Oliveras to say she wanted to see "Alborada" promoted twice an hour.  (SUMF, ¶ 38).[2]  On January

16, 2006, Rodríguez e-mailed Oliveras to ask why a promotion for "Cristina" aired instead of a

promotion for "Alborada."  (SUMF, ¶ 39).  On February 6, 2006, Rodríguez e-mailed Oliveras

asking why a promo for "Sin Editar," a prime-time show, did not include the phrase "Great

Premiere."  (SUMF, ¶ 40).  On April 10, 2006, Rodríguez e-mailed Oliveras to ask him to alter a

promo and add graphics saying that "Alborada" was in its last weeks.  (SUMF, ¶ 41).  The promo

had a voice-over stating that it was in its final weeks, but not a graphic.  (SUMF, ¶ 42).  On May 8,

2006, Rodríguez e-mailed Oliveras after a promo aired with the wrong date for the final chapter of

"Alborada," and told Oliveras that this type of error could not take place.  (SUMF, ¶ 46).  In his

statement under penalty of perjury, Sands stated that he was not satisfied with Oliveras's

---

[2] Oliveras objects to considering a number of e-mails submitted by Univision on the grounds that they were not
disciplinary complaints or memos, and that other testimony shows there were no negative actions in Oliveras's personnel
file prior to March 31, 2008.  These objections go to the inferences and conclusions to be drawn from the e-mails, not
their admissibility; therefore, these objections are overruled.

performance promoting "Alborada."[3]  (SUMF, ¶ 37).  Rodríguez also stated that she was not pleased with Oliveras's performance promoting "Alborada."  (Id.).

On April 10, 2006, Rodríguez e-mailed Oliveras to tell him that "Cristina" and "Don Francisco" needed to be promoted because they had new schedules.  (SUMF, ¶ 44).  On April 17, Rodríguez e-mailed Oliveras saying she had not seen a promo airing frequently that announced the shows' new schedules.  (Id.).  Rodríguez also e-mailed Oliveras to tell him that the promotion for the premiere of the Walter Mercado show did not say "Great Premiere."  (SUMF, ¶ 43).  On April 26, 2006, Rodríguez e-mailed Oliveras asking him to ensure more rotation of promos regarding the shows' new schedule.  (SUMF, ¶ 45).  On May 8, 2006, Rodríguez e-mailed Oliveras saying that although she asked for changed wording in the May 2006 "block promo," it aired with incorrect wording, and that it needed to be refreshed regarding a show that already ended, "Contra Viento y Marea."  (SUMF, ¶ 48).

Oliveras's compensation increased to $85,000 base pay for the year starting May 10, 2006. (SUMF, ¶¶ 7–8).

On June 23, 2006, Rodríguez e-mailed Oliveras saying that the promotion for "Cristina" was wrong because it did not mention certain featured personalities that would be on the show.  (SUMF, ¶ 50).  On July 25, 2006, Rodríguez e-mailed Oliveras asking for greater attention to detail in his department because ten-second station IDs were airing at the wrong time of the hour.  (SUMF, ¶ 51). Rodríguez e-mailed about the timing of station IDs again on August 6, 2006.  (SUMF, ¶ 54).  On August 7, 2006, Rodríguez emailed Oliveras questioning a mistake in the promotion of the *novela* "La Verdad Oculta," and told him there was no room for errors in his execution of the launch. (SUMF, ¶¶ 55–56).  On August 13, 2006, Rodríguez e-mailed Oliveras asking why a 120-second promo related to the beginning of the *novela* "Peregrina" was scheduled to air while it was in its final

---

[3] Oliveras objects to this and similar statements of Sands and Rodríguez as conclusory and lacking foundation. This objection is overruled to the extent the statements are offered to prove what Sands and Rodríguez's impressions and perceptions were, rather than whether or not Oliveras met some measurable standard of performance or skill.

chapters, and telling him she did not want 120-second promos airing in prime time.  (SUMF, ¶ 58).

In her statement under penalty of perjury, Rodríguez says she perceived this as an error resulting

from Oliveras's "misguided strategy" as Promotions Director.  (Id.).  On August 23, 2006, Lippman

e-mailed Oliveras telling him he liked a hurricane promo he saw.  (PARF, ¶ 8).  On August 30, 2006,

Rodríguez e-mailed Oliveras telling him promos for the *novela* "Olvidarte Jamás" aired during the

show's launch period without saying the phrase "Premiere."  (SUMF, ¶ 59). On September 7, 2006,

Rodríguez e-mailed Oliveras asking for a new promotion of the schedule for the program "Casos de

Familia" because viewers were calling to ask about the status of the show.  (SUMF, ¶ 60).

### *September 2006–May 2007: Pellot's promotion, non-renewal of Oliveras's contract*

Pellot was promoted to Assistant Director of the Promotions Department, effective

September 15, 2006.  (SUMF, ¶ 61).  Sands attests that he promoted Pellot because he believed

Oliveras was making too many mistakes and wanted Oliveras to have time to focus on promotional

strategy, the programming log, "Jingles" and special events, the station's overall image, and on

dealing with the ad agency and promotion in outside media.  (SUMF, ¶ 62).  However, Sands did

not tell Oliveras this rationale at the time.  (PARF, ¶ 14).  Prior to promoting Pellot, Sands met with

Oliveras and told him that Pellot would be promoted so she could take over some of Oliveras's

responsibilities and allow him to focus on more important things.  (SUMF, ¶ 64).  Pellot's new

responsibilities were direct supervision of the Promotions Department, working with Promotion

Producers on daily execution of promotional strategies and overseeing quality, working with

Univision's agency to create and execute press campaigns related to launches and daily recaps, and

working with Oliveras in assigning and distributing workload to editors.  (SUMF, ¶ 66).  At the time

Pellot was promoted, she took over Oliveras's responsibility of assigning work to promotions

producers in the Promotions Department.[4]  (SUMF, ¶ 67).  Following Pellot's promotion, Oliveras's

---

[4] Oliveras challenges this fact in his statement under penalty of perjury, which states "Although the
responsibility of assigning and distributing the workload to the producers was a shared responsibility, around September
2007, Rodríguez began to take this responsibility away from me and to give it to Luani Pellot."  (Docket No. 58-1, ¶ 20).
However, Univision argues that this paragraph of Oliveras's statement contradicts his deposition testimony and should

major responsibilities were dealing with outside media through Young & Rubicam, and his daily

work concerning the programming log.  (SUMF, ¶ 68).

On November 6, 2006, Rodríguez e-mailed Oliveras because she saw a third promo for News

air during prime-time, and said it should not have run when there were already two full News

promos. (SUMF, ¶ 70).  On December 11, 2006, Rodríguez e-mailed Oliveras telling him there were

problems with the logs slowing down the traffic team, and asking how to improve the situation.

(SUMF, ¶ 71).

On March 1, 2007, Rodríguez e-mailed Oliveras after seeing a promo she did not believe

should have aired at the time it did, and asking him to ensure that that type of promo did not run

during that time period again.  (SUMF, ¶ 72).  On March 23, 2007, Sands e-mailed Oliveras asking

---

be struck. (Docket No. 65, p. 5–6).  When an affidavit, particularly one offered at summary judgment, contradicts clear answers to unambiguous questions and does not explain the change in testimony, the contradictory affidavit may be disregarded.  Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4–5 (1st Cir. 1994).  Oliveras's response to Univision's motion to strike cites an excerpt of his deposition:

> Q   You mentioned that with Luani Pellot's promotion to assistant director of the promotions department, she was going to be taking over some of the functions or duties that would've been assigned to you.  Correct?
> A   Yes.
> Q   Okay.  Which were those assignments?
> . . .
> A   . . . Finally working with myself in assigning and distributing--
> Q   Distribution--
> A   --the workload for the promotions and editors.  (Electronic interference due to cell phone).
> Q   Is that how it happened?  Was it just yourself and Luani distributing the work, or it was just her?  How did it, how did it operate from that point onward?
> A   We worked together, immediately after this memo, we worked on the editors assignments.  Later on, the editors assignments were also made Luani's responsibility.

(Docket No. 27-4, p. 18–20).  Oliveras argues that "Later on, the editors assignments were also made Luani's responsibility" is consistent with his statement under penalty of perjury that "assigning and distributing the workload to the producers" was taken away from him starting in September 2007.  (Docket No. 73, p. 4).  However, the very next question and answer contradict his statement:

> Q   Okay, how about the producers?
> A   As per September 15, Luani's responsibilities.

(Docket No. 27-4, p. 20).  Oliveras's deposition testimony was in the context of discussing changes following Pellot's promotion on September 15, 2006.  His response is clear: the distribution of work to producers was, as of September 15, Pellot's responsibility.  Oliveras's statement under penalty of perjury does not provide any explanation for the change in testimony.  Therefore, paragraph 20 of Oliveras's statement under penalty of perjury is struck to the extent it discusses when Pellot began assigning work to producers, and will not be considered for that purpose.

him if the station needed to change its promotion strategy for "Acorralada," because it was not performing well in the ratings. (SUMF, ¶ 73). In May 2007, Sands had a conversation with Oliveras in which he told Oliveras his contract was not going to be renewed at that time. (SUMF, ¶ 74). Oliveras's contract ended on May 9, 2007. (Id.). Sands told Oliveras that he had not renewed his contract because he and Rodríguez were not in agreement about his performance, and that any renewal would be retroactive.[5] (PARF, ¶ 19). In his statement under penalty of perjury, Sands said he had concerns regarding Oliveras's performance and leadership in the Promotions Department. (SUMF, ¶ 75).

### *May 2007–March 2008: "Habla Puerto Rico," Governor Acevedo coverage*

On June 12, 2007, Sands e-mailed Oliveras asking why news and *novelas* were not being promoted on the radio. (SUMF, ¶ 76).

Univision News and Univision Radio organized an event scheduled for August 21, 2007 in Loiza, Puerto Rico called "Habla Puerto Rico," moderated by Univision personalities and featuring the Governor of Puerto Rico as a participant. (SUMF, ¶¶ 77–78). Oliveras's responsibility was to oversee special events, including "Habla Puerto Rico," from a promotional standpoint. (SUMF, ¶ 79). Rodríguez e-mailed Oliveras at 9:39 a.m. asking where Univision's banners for the event were, and e-mailed again a few minutes later saying the lack of banners was unacceptable. (SUMF, ¶ 80). Rodríguez had loaned the banners to ES Tv several days before, taking additional banners that Oliveras had intended to save for the "Habla Puerto Rico" event. (PARF, ¶ 20). The banners were still not on site at 10:30 a.m., and the program was scheduled to start at noon. (SUMF, ¶ 81).

---

[5] Univision objects to this statement on hearsay grounds. (Docket No. 69, p. 119, ¶ 19). Oliveras does not respond to Univision's objection; nevertheless, "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship." Fed R. Evid. 801(d)(2)(D). There is no dispute that Sands was the highest-ranking officer of Univision (SUMF, ¶ 152), who recruited Oliveras (SUMF, ¶ 6), determined Oliveras's compensation (SUMF, ¶ 8), and ultimately told Oliveras he was fired (SUMF, ¶ 152). The matter of Oliveras's employment with Univision is therefore within the scope of Sands's agency or employment for purposes of the hearsay rule. Sands's statements may be offered against Univision as non-hearsay.

However, the banners were in place when the program started.  (PARF, ¶ 20).

On September 19, 2007, Sands e-mailed Oliveras asking what his plan was to address a loss in "lead-in share" between two *novelas*, and asking for additional details on another promotional deal.  (SUMF, ¶ 82).

On February 12, 2008, Otto Padrón, Univision Network's Vice-President of Programming and Promotions, e-mailed Oliveras saying "Thanks a million Shark!" in response to a series of e-mails regarding a promotion project.  (PARF, ¶ 9).  Sometime in February, six weeks before March 31, Sands and Rodríguez told Oliveras he was being recommended for a position at the network because of his experience, knowledge, and leadership.  (PARF, ¶ 26).  On March 18, 2008, Sands e-mailed two other people, Terry Macking and Ray Rodríguez, telling them Univision had 20 of the top 25 programs for women 18 to 49 years old and adults 18 to 49 years old.  (PARF, ¶ 10).  Ray Rodríguez replied congratulating Sands and asking him to pass on congratulations to his team.  (Id.).  On March 19, 2008, Sands forwarded Ray Rodríguez's e-mail to"San Juan—Department Heads," which included Oliveras.  (Id.).

On Thursday, March 27, 2008, federal authorities made accusations against Governor Anibal Acevedo Vilá ("Acevedo"), and Acevedo surrendered to federal authorities on Friday, March 28, 2008.  (SUMF ¶ 84).  Univision newscasts were extended to cover the event, interrupting regular programming at the station.  (SUMF, ¶ 85).  This required Oliveras to make constant changes to the programming logs.  (PARF, ¶ 22).  At that point in time, Oliveras had a variable commitment to pick up his nephews from daycare two to three times per week.  (SUMF, ¶ 89).  However, Oliveras did not recall what time he left the station on March 27 and 28.[6]  (SUMF, ¶ 88).  When Oliveras arrived

---

[6] In his statement under penalty of perjury, Oliveras claims he left between 5:15 and 5:30 p.m. both days in order to pick up his nephews.  (Docket No. 58-1, ¶ 24).  Univision points out that in his deposition, Oliveras stated he did not remember what time he left on March 27 and 28.  (Docket No. 65, p. 9–10; Docket No. 27-4, p. 45–46, 48).  Moreover, Oliveras also did not recall whether he had to pick up his nephews.  (Docket No. 27-4, p. 48–49, 51).  Oliveras argues that there is no contradiction with his deposition testimony because he also testified in his deposition that he didn't recall whether, in a later meeting with Sands, he admitted leaving early to pick up his nephews.  (Docket No. 73, p. 6).  This

at the station on March 28, he told Sands an idea he had for a "proof of production," which was produced later that day.  (PARF, ¶ 22).  Neither Sands nor Rodríguez solicited Oliveras's feedback on March 27 and 28, and they did not request his presence on the News Floor or in Master Control. (Id.).

### *March–August 2008: Meetings, memoranda, and termination*

Sands summoned Oliveras to his office on the morning of March 31, 2008.  (SUMF, ¶ 90). In his statement under penalty of perjury, Sands stated he summoned Oliveras "[a]s a direct result of Oliveras'[s] lack of presence and support" during the March 27–28 coverage.  (Id.).  Sands, Rodríguez, and News Director Susanne Ramírez de Arellano ("Ramírez") were present and spoke at the meeting.  (SUMF, ¶ 91).  At the meeting, Oliveras was accused of failing to do his job - specifically, that he failed to perform his duties during the Acevedo crisis, that his presence was not felt in the news department and master control area, and that he failed to deliver with respect to "Casa Huracanes," a News Department special event.  (SUMF, ¶ 92).  Oliveras was told that Sands and Rodríguez did not feel his presence because he left the station both days at 5:00 p.m. without returning, while the rest of the Promotions team continued working.[7]  (SUMF, ¶ 94).  Oliveras told that he did not propose or suggest strategies concerning special promos which were produced under the instructions of Sands and Rodríguez.  (SUMF, ¶ 95).  Oliveras was also told six "proofs of performance" and news promos were produced without his presence or support.  (SUMF, ¶ 95). Oliveras was told at the meeting that his presence on the news floor was needed to review ideas and

---

argument misses the mark: there is no explanation for why Oliveras *now* recalls his day care obligation or the time of day he left on March 27 and 28.  Therefore, paragraph 24 of Oliveras's statement under penalty of perjury is struck to the extent it discusses when he left the station and whether he picked up his nephews, and will not be considered for that purpose.  See Colantuoni, 44 F.3d at 4–5; see also Murphy v. Ford Motor Co., 170 F.R.D. 82, 85 (D. Mass. 1997) (rejecting affidavit where plaintiff's deposition testimony was "that he did not specifically remember looking at" certain pages of a document, while the later affidavit stated "that he did, in fact, read the relevant pages.").

[7] Oliveras objects that there is no foundation for Sands's personal knowledge of whether he was at the station. The statement is admissible only to show what Oliveras was told at the meeting, and not when he actually left the station.

strategy, but that his absence made this impossible. (SUMF, ¶ 96). Sands reminded Oliveras of their conversation in May 2007, and that he did not presently have a contract. (SUMF, ¶ 97). The meeting also touched on Oliveras's performance with regard to strategy, and a need for Oliveras to improve his leadership and communication skills. (SUMF, ¶ 98–99). Oliveras denies that Sands told him he needed to improve strategy and communication. (Docket No. 58-1, ¶ 26). Sands attests that he and Rodríguez told Oliveras this, while Rodríguez attests that Sands, herself, and Ramírez were the people who told Oliveras this. (Docket No. 27-1, ¶ 35; Docket No. 27-6, ¶ 49). Thus, the parties dispute whether Sands told Oliveras that he needed to improve his strategy and communication, but do not dispute that Rodríguez or Ramírez told Oliveras the same thing. At the meeting, Oliveras said he left early on March 27 and 28. (SUMF, ¶ 100).[8]  Oliveras was told he would receive a summary memorandum following the meeting. (SUMF, ¶ 101). The parties dispute whether Sands told Oliveras that he and Rodríguez would meet with him in 30 days. (SUMF, ¶ 102; PARF, ¶ 25).

Following the meeting, Oliveras spoke to his attorney; the attorney sent a letter to Rodríguez's fax number. (SUMF, ¶ 103). The letter stated that Oliveras's attorney was retained to file a sex and age discrimination complaint, and offered to settle the matter for a fixed sum. (SUMF, ¶ 108). Oliveras's attorney sent the fax on March 31, 2008. (PARF, ¶ 27). Oliveras had never voiced a complaint of discrimination or of being stripped of his duties prior to the March 31, 2008 meeting. (SUMF, ¶ 110). Following the meeting, Rodríguez only spoke with Oliveras face-to-face during staff meetings, and ignored him in Promotions Department meetings. (PARF, ¶ 37).

Rodríguez left on vacation following the meeting, and was out of the office through Friday, April 4, 2008. (SUMF, ¶ 109). On April 1, 2008, Karen Padín ("Padín"), Rodríguez's assistant,

---

[8] Oliveras denies this on grounds that he did not leave early, but does not contest whether, at the meeting, he *said* he left early.

**Gerardo Oliveras Zapata v. Univision Puerto Rico, Inc.**                                   Page 13
CIVIL NO. 09-1987 (BJM)
**OPINION AND ORDER**

asked Oliveras whether he was filing a complaint against the company.[9]  (PARF, ¶ 27).  Padín found

the fax from Oliveras's attorney on Rodríguez's fax machine on April 4, 2008.  (SUMF, ¶ 107).

Padín immediately delivered the letter to risk management officer Janet Contreras, who then turned

it over to human resources manager Jeannette Reyes ("Reyes").  (Id.).  Reyes and Sands met with

Oliveras on April 4, 2008, to hand him the memorandum summarizing the March 31 meeting.

(SUMF, ¶ 104).  Oliveras would not sign the memorandum until he consulted with his attorney.

(SUMF, ¶ 105).  When Oliveras told Sands he had legal representation, Sands responded that

Oliveras did not need a lawyer for anything, and banged on the desk.[10]  (PARF, ¶ 28).  Oliveras told

Reyes that in January 2008, Rodríguez and Sands had told him he was being recommended for a

position with the network in Miami, after which Sands became angry and banged on the desk again.[11]

(PARF, ¶ 29).  After this meeting, Sands would only speak with Oliveras at staff meetings.  (Id.).

Later, on April 4, 2008, Oliveras e-mailed Sands and Rodríguez stating he intended to file a

discrimination complaint, making reference to his attorney's earlier fax.  (SUMF, ¶ 106).

On April 10, 2008, Univision's Vice President and Senior Legal Counsel, Ayra Towfighi,

faxed a letter to Oliveras's attorney, responding to the letter dated March 31, in which Towfighi

stated "if Mr. Oliveras wishes to withdraw his baseless threat of litigation and simply discuss his

departure from the company in a more amicable fashion, I am certainly open to doing so."  (PARF,

¶ 31).

On April 15, 2008, Oliveras wrote an e-mail in which he complained that he had been

---

[9] Univision objects to this as hearsay.  Oliveras's account of Padín's question is only admissible to prove that Padín asked this question.

[10] Univision objects to this statement as hearsay.  As discussed earlier, Sands's statements regarding Oliveras's employment are non-hearsay against Univision.  Because this was a meeting discussing Oliveras's employment, this comment is also non-hearsay.

[11] Univision objects to this statement as hearsay.  It is only admissible to show that Sands heard Rodríguez say this to Reyes.

stripped of his duties, that those duties had been assigned to Pellot, and that Rodríguez was not following the chain of command by directly instructing Pellot and the Promotion Producers; Oliveras sent the e-mail to Rodríguez and copied Reyes. (SUMF, ¶ 111). The e-mail also stated that he wanted Rodríguez to direct Promotions Department orders to him, and threatened to file an additional charge of retaliation with the EEOC and ADU. (PARF, ¶ 32). Rodríguez replied on April 17, 2008, addressing his allegations, and reiterated Univision's interest in having Oliveras improve his performance and concentrate on his job duties. (SUMF, ¶ 112). Rodríguez's reply also stated that "As it was explained to your attorney, your attempts to 'save' your job by making false accusations of discrimination will not have the desired effect. . . . If, however, you have no desire to remain employed by Univision, you should continue down this path of not accepting any responsibility for your actions (or lack of action)." (PARF, ¶ 33).

Reyes commenced an investigation of Oliveras's allegations in which she met and interviewed Rodríguez, Pellot, Pagán, and Colón. (SUMF, ¶¶ 113–114). Reyes did not take notes during her interview with Rodríguez, as it was brief, but she took notes of her interviews with Pellot, Pagán, and Colón. (SUMF, ¶ 116). Reyes asked them about allegations or complaints of discrimination by Rodríguez against Oliveras, and inquired as to the manner in which the Promotions Department functioned and operated. (SUMF, ¶ 117). Her notes did not include the phrases "discrimination" or "stripped of his duties." (PARF, ¶ 60). None of the employees Reyes interviewed reported complaints or comments by Oliveras concerning Rodríguez, or allegations of discrimination. (SUMF, ¶ 119). Reyes solicited feedback from Oliveras regarding a memo delivered on June 12, 2008, but Oliveras responded that he had to consult his attorney first, and did not get back to her. (SUMF, ¶ 115). Reyes did not approach Oliveras on other occasions, and did not interview him. (PARF, ¶¶ 34, 63). Reyes said it is important to document someone's refusal to cooperate; nevertheless, there was no such annotation in Oliveras's personnel file. (PARF, ¶ 74). Oliveras's personnel file did not have complaints, warnings, or memos regarding his performance

prior to March 31, 2008, and all warnings and memos in the file were written after March 31. (PARF, ¶¶ 66–69). According to Reyes, all written warnings and memos must be included in an employee's personnel file. (PARF, ¶ 65). Reyes said that when an employee is disciplined for performance, she would be consulted, depending on the manager. (PARF, ¶ 73; Docket No. 69, p. 136, ¶ 73).

On April 28, 2008, Rodríguez e-mailed Oliveras regarding an error in a full-page newspaper advertisement, in which the premiere date of the *novela* "Al Diablo con los Guapos" was incorrect. (SUMF, ¶ 120). Oliveras was not aware of this error until Rodríguez sent him the e-mail. (SUMF, ¶ 121). The error occurred at Univision's ad agency, Young & Rubicam. (PARF, ¶ 35). On April 28, 2008 at 5:24 p.m., Sands e-mailed Rodríguez and Oliveras regarding mistakes in promos airing April 26–27, 2008. (SUMF, ¶ 122). Rodríguez's reply described one of the mistakes and the step she took to correct it. (PARF, ¶ 36). Oliveras later replied as well. (Id.). In his statement under penalty of perjury, Sands said that it seemed to him that Oliveras was often unaware of errors and did not investigate them until after Rodríguez or Sands brought them to his attention. (SUMF, ¶ 122).

On June 10, 2008, Rodríguez e-mailed Oliveras telling him that promos for the *novela* "Lola" were running in the middle of the night and early morning, and not daytime. (SUMF, ¶ 123). Rodríguez had e-mailed Oliveras on April 17, 2008 and May 27, 2008 mentioning that "Lola" promos should air during daytime hours. (Id.). Oliveras had these promos run at dawn and in the morning. (PARF, ¶ 42). Rodríguez's June 10, 2008 e-mail also asked him to air promos for the *novela* "Palabra de Mujer" with greater frequency. (SUMF, ¶ 124).

On June 12, 2008, Sands and Rodríguez met with Oliveras at Sands's office, where he was presented with a follow-up memorandum regarding performance. (SUMF ¶¶ 125, 127). In his statement under penalty of perjury, Sands says he waited 60 days from the previous meeting in order to give Oliveras more time to demonstrate improvement. (SUMF, ¶ 126). Oliveras did not sign the memorandum or address the issues in it. (SUMF, ¶ 128–129). The memorandum said Oliveras

failed to participate in the creative process of the launch campaigns of "Al Diablo con los Guapos,"

"Pasión," "Palabra de Mujer," "Amas de Casas Desesperadas," or "Panteras." (SUMF, ¶¶ 130, 133).

However, Oliveras believes his participation in "Amas de Casas" and "Panteras" was consistent with

Rodríguez's instructions.   (PARF, ¶ 39).   Sands and Rodríguez approved the "Up Front

Presentation" Oliveras developed for "Amas de Casas" and "Panteras," and they used it for

launching the shows. (PARF, ¶ 39). The memorandum said Oliveras did not participate or provide

support regarding the Summer Jingle, and that he was not present during its filming on June 4, 2008.

(SUMF,¶ 131).   The execution of the jingles was one of Oliveras's Promotions Director

responsibilities, and he was supposed to be present for filming when possible.  (SUMF, ¶ 132).

However, Rodríguez, Pellot, and Pagán were in charge of the production and filming of the jingles,

and Rodríguez's instructions were that Pellot and Pagán were to be at the filming site.[12]  (PARF, ¶

38).   The memorandum criticized his performance regarding promotion of hurricane season for

Univision News.  (SUMF, ¶ 134).  However, Oliveras had a campaign ready on time, and was only

delayed because he was awaiting approval from Ramírez, the News Director.  (PARF, ¶ 40).  The

memorandum criticized his performance regarding the programming logs and the timing of promos

of "Al Diablo con los Guapos" and "Lola Erase Una Vez."  (SUMF, ¶ 135).  Oliveras believed he

was following Larry Sands's instructions with regard to scheduling promos, and recalls that the "Al

Diablo con los Guapos" promos did not fail to run during prime-time schedules. (PARF, ¶ 41). The

memorandum also criticized his performance in the Promotions Department internal disciplinary

process.  (SUMF, ¶ 135).  With regard to discipline and Tanco's performance, Oliveras attempted

to set up a meeting with Reyes to discuss the matter, but Reyes did not schedule the meeting.

(PARF, ¶ 44). The memorandum said Oliveras's responsibility for outlining promotional strategies,

---

[12] Univision argues that this contradicts Oliveras's deposition testimony, in which he stated that he was
responsible for execution of the jingles. (Docket No. 27-3, p. 52). However, "execution" and "production and filming"
are not so indistinguishable as to create a contradiction, and Univision does not provide other context from which to infer
that Oliveras was describing the same responsibilities in his statement and in his deposition.  Therefore, this paragraph
is not struck.

taking initiative, and being a leader were below Sands and Rodríguez's expectations, and that Oliveras would have 60 days to show improvement.  (SUMF, ¶¶ 136–137).  Sands did not tell Oliveras this himself.  (PARF, ¶ 45).

On July 6, 2008, Rodríguez e-mailed the Promotions Team expressing frustrations with promotions that did not air, and that she had to manually correct the programming log.  (SUMF, ¶ 138).  In her statement under penalty of perjury, Rodríguez said she considered an error regarding the length of the scheduled promo to be a strategic error by Oliveras.  (SUMF, ¶ 139).  Oliveras told Rodríguez that Pellot caused the mistake to happen.  (PARF, ¶ 46).  On July 28, 2008, Rodríguez e-mailed Oliveras and asked him to pull the promo for the show "Premios Juventud" because she saw it air at the wrong time.  (SUMF, ¶ 140).  Oliveras did not schedule the promo, and by July 29 it was out of circulation.  (PARF, ¶ 47; Docket No. 69, p. 101, ¶ 140).  On July 31, 2008, Sands e-mailed Rodríguez and Oliveras regarding an incorrect radio promotion, and asking whether there was a control system to prevent that type of problem; Sands stated he thought the problem happened a lot.  (SUMF, ¶¶ 141–142).  Oliveras consulted Pellot regarding what the control system was prior to responding.  (SUMF, ¶ 143).  Oliveras's responsibilities included dealing with outside media, such as the radio station.  (SUMF, ¶ 144).

On August 20, 2008, at 11:03 a.m., Oliveras e-mailed Lippman telling him a "proof of performance" was in production relating to new charges against the governor.  (PARF, ¶ 49).  At 1:45 p.m., Lippman e-mailed Oliveras stating that he had hoped the proof of performance would have been on the air already.  (SUMF, ¶ 145).  On August 21, 2008, Sands e-mailed Oliveras and Rodríguez asking what the station's strategy was concerning special election coverage, and asking to see the special election promos.  (SUMF, ¶ 146).  Oliveras told Pellot to send an MP4 of the promo, which had been produced and was airing.  (PARF, ¶ 50).  In his statement under penalty of perjury, Sands said he did not believe Oliveras had been proactive as Promotions Manager, particularly regarding the elections.  (SUMF, ¶ 146).

Oliveras was terminated on August 22, 2008 at a meeting in Sands's office with Sands,

Lippman, Rodríguez, and Human Resources Department member Elliot Pérez ("Pérez").  (SUMF, ¶ 147).  Sands informed Oliveras that he was being terminated.  (SUMF, ¶ 152).  Oliveras did not speak during the meeting, but was informed that he had a check for his accrued vacations, and that Pérez would explain his COBRA rights.  (SUMF, ¶ 148–149).  The parties dispute whether Sands was the ultimate decision-maker as to Oliveras's termination; Sands attests that he made the decision himself, while Oliveras infers the participation of Rodríguez based on her April 17 e-mail, authorship of the June 2008 performance memo, and presence at the termination meeting.  (SUMF, ¶¶ 5, 150; Docket No. 58, p. 2–3, ¶ 5).  Oliveras was 47 years old when he was terminated.  (PARF, ¶ 53).  Sands was 45 years old when Oliveras was terminated.  (SUMF, ¶ 6).

*September 2008–February 2009: Administrative charges*

Oliveras's discrimination charge was based on the assignment of his duties to Pellot, a female who is younger than him.  (SUMF, ¶ 154).  Oliveras does not recall any comments at Univision regarding his age or gender.  (SUMF, ¶ 155).  Oliveras concluded during the March 31, 2008 meeting at Sands's office that the assignment of duties and responsibilities to Pellot was discriminatory on account of age and gender.  (SUMF, ¶ 156).  Oliveras's retaliation claim is based on Sands's reaction to Oliveras mentioning his attorney on April 4, 2008, his belief that the April 4, 2008 meeting was in response to his attorney's letter, and his belief that his environment became difficult because of accusations, e-mails, and memos towards him.  (SUMF, ¶ 157).

Oliveras filed a charge with the Anti Discrimination Unit of the Puerto Rico Department of Labor on September 24, 2008.  (SUMF, ¶ 158).  Boxes on the form for FEPA and EEOC were marked.  (Docket No. 58, p. 34; Docket No. 36-4).  In the charge form, Oliveras alleged he was dismissed due to sex and age, that Rodríguez began stripping him of his functions, that he was subject to unjustified reprimands, that Rodríguez ignored the hierarchy, that his attorney notified Univision of his intent to file a discrimination complaint, that he subsequently was the subject of unjustified memos and was ignored in the company, and that his dismissal was retaliatory.  (Docket No. 36-4, p. 2).

Oliveras filed another discrimination charge with the Equal Opportunity Employment Commission (EEOC) on February 23, 2009.  (SUMF, ¶ 160).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material only if it "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  The court does not weigh the facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1).  Once this threshold is met, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  However, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," Leary, 58 F.3d at 751, and an evaluating court may not "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." Greenburg v. P.R. Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

Nonetheless, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the claim. Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

**Gerardo Oliveras Zapata v. Univision Puerto Rico, Inc.**   Page 20
CIVIL NO. 09-1987 (BJM)
**OPINION AND ORDER**

## DISCUSSION

## I.    Discrimination under the ADEA and Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). The ADEA makes it illegal for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Claims for age and sex discrimination may be proven under a burden shifting framework. When a plaintiff establishes a *prima facie* case of discrimination, the employer has the burden of producing a legitimate, nondiscriminatory reason for its action; "[i]f the employer does so, the focus shifts back to the plaintiff, who must show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) (citation and quotation marks omitted).

At summary judgment, particularly in cases where the parties' focus is on whether the employer's grounds for its actions are pretextual, "a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Gómez-González, 626 F.3d at 662 (citation and quotation marks omitted). Univision concedes in its motion that Oliveras established his *prima facie* case, except that he did not show he satisfied Univision's legitimate expectations for the job. (Docket No. 26, p. 12–13). However, Oliveras's alleged lack of performance is also Univision's proffered nondiscriminatory rationale for the complained-of actions. (See Docket No. 26, p. 14, 21–22). The employer's rationale cannot be considered in analyzing the *prima facie* case, as it may "deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." Meléndez v.

Autogermana, Inc., 622 F.3d 46, 51 (1st Cir. 2010) (citation omitted). It is therefore appropriate to proceed directly to the question of whether Oliveras can show that his alleged poor performance was a pretext for discrimination, and whether Oliveras presents a triable question regarding Univision's discriminatory animus.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Gómez-González, 626 F.3d at 662-63 citation omitted). In age discrimination cases, a plaintiff "must elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." Meléndez, 622 F.3d at 52 (internal citation and quotation marks omitted). In sex discrimination cases, the ultimate question is "whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that she was fired because of her gender." García v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008) (citation and brackets omitted).

Here, Oliveras questions Univision's rationale in light of several forms of positive feedback he received prior to March 31, 2008, together with the absence of express, direct criticism of his skills. (Docket No. 54, p. 6–12). Some of the positive feedback Oliveras cites spoke of the Promotions Department as a whole, of particular projects, and of outcomes: the Group Promo Award in 2005, Lippman's e-mail regarding the August 2006 hurricane promo, the letter from Otto Padrón, and the positive program rankings in March 2008. Other instances were directed at Oliveras himself: Lippman awarding him the Golden Tulip Broach in 2005, and Sands and Rodríguez's statement to Oliveras that he was being recommended for a position with Univision Network in Miami. Oliveras also argues that because Univision had the option to terminate or not renew him under his employment contract, it should be inferred that allowing him to stay on and receive raises was an

endorsement of his performance.[13]  From this positive feedback, Oliveras argues that a rational jury

could conclude that poor performance is an untruthful explanation for why responsibilities were

taken away from him, why Rodríguez bypassed him in the chain of command, why he was subjected

to close scrutiny of his performance, and why he was terminated.  But the uncontested facts also

show instances of negative feedback.  Some were directed at broad issues: programming logs

slowing down the traffic team in December 2006, "Acorralada" ratings in March 2007, and lead-in

ratings in September 2007.  Many of the e-mails cited by Univision addressed particular problems

observed by Rodríguez and Sands, including a series of issues with "Alborada."  As for the March

2008 Acevedo coverage, Sands and Rodríguez voiced concerns about his presence at the station,

while Oliveras asserts that he did good work and was never explicitly summoned by Sands or

Rodríguez to provide his presence or feedback.  On balance, Oliveras's instances of good

performance are not probative of whether Univision acted because of its proffered reason or not.

There is no way a rational jury could find weakness, inconsistency, or implausibility in a company

deciding that an employee who has performed well on some occasions and poorly on others should

have his duties changed, performance scrutinized, or ultimately be fired.  "In essence, he asks us to

excuse his performance by replacing [Univision's] business judgment with his own, an untenable

position."  Velásquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 12 (1st Cir. 2007).

Oliveras further argues that the explanation Sands gave Oliveras for Pellot's promotion

(wanting Oliveras to focus on more important things) is inconsistent with his recent statement that

he promoted her because Oliveras was making too many mistakes. (Docket No. 54, p. 9–10).  From

this, Oliveras concludes that "[i]t would have been an irrational and illogical decision, to say the

least, for Univision to assign Oliveras an Assistant Director . . . when it would have been easier for

Univision to exercise its option under Oliveras's contract and terminate his employment." (Docket

No. 54, p. 10).  But regardless of how irrational and illogical this decision and its rationale may be,

---

[13] Without deciding whether this is how the contract must be construed, this will be assumed as an inference
to be drawn in favor of Oliveras at summary judgment.

it is not so weak or implausible that it could rationally be regarded as pretext.  Moreover, "[c]ourts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991).  Oliveras's argument about the rationality of being retained and enjoying increased pay is equally untenable.

Oliveras also argues that it is implausible and irrational that Univision acted on performance grounds when his personnel file did not contain formal warnings or complaints prior to March 31, 2008, given Univision's size and alleged sophistication.  While an inexplicable deviation from standard business practices may demonstrate pretext, a plaintiff must first show there is a trialworthy issue as to whether such a standard practice existed.  See Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 68-69 (1st Cir. 2008).  Here, Oliveras has not established, or even inferred, whether there was a standard for when a formal performance complaint must be made, or whether there was a practice requiring formal discipline before altering an employee's duties.

Finally, Oliveras's argues that Sands and Rodríguez could not have honestly believed he was performing poorly since 2006 because in January 2008 they told him that they were recommending him for a position with the network in Miami.  Yet even giving this statement full weight,[14] the doubt this casts is minimal.  A rational person could infer that Sands and Rodríguez did not have misgivings about Oliveras when they promoted Pellot or shifted duties to her.  However, this statement also undercuts Oliveras's core allegations of discrimination: if he was suffering adverse employment actions under Sands and Rodríguez because of his age or sex, it is unclear why Sands or Rodríguez would tell him he was being recommended for a promotion.  They were either lying about recommending him - in which case they may indeed have doubted his ability to perform, and there is no pretext - or they were being truthful, and acting against their supposed discriminatory tendencies.  Cf. García, 535 F.3d at 34 ("Indeed, the inferences run against García.  If Vélez were

---

[14] As Univision points out, the only source of evidence regarding this statement by Sands and Rodríguez comes from Oliveras's statement under penalty of perjury.  (Docket No. 69, p. 118, ¶ 26).

**Gerardo Oliveras Zapata v. Univision Puerto Rico, Inc.**                                    Page 24
CIVIL NO. 09-1987 (BJM)
**OPINION AND ORDER**

truly determined to see a woman in her position fail, it is unlikely he would have noted the short-term improvements in her PIP performance or extended her PIP to give her more time to meet expectations.").  No rational jury could reason that both (1) Sands and Rodríguez had actually recommended him for a promotion and (2) Sands and Rodríguez were discriminating against Oliveras because of his age or sex.

Most importantly in deciding this case, however, the ultimate question for a discrimination claim is not whether the proffered rationale is a sham, but whether it is a sham intended to cover up discrimination.  See Meléndez, 622 F.3d at 52;  García, 535 F.3d at 31.  Nothing in the evidence offered by either party supports a rational inference that there is a cover-up of age or sex discrimination.  The parties agree that Oliveras does not recall anybody making comments related to his age or gender while at Univision.  (SUMF, ¶ 155).  "Possibly in some contexts a showing of a false explanation can add weight to a discrimination claim supported by evidence; but it is hard to imagine such a case where there is *no* evidence of a discriminatory motive in the first place . . . ." Casamento v. Mass. Bay Transp. Auth., 550 F.3d 163, 165 (1st Cir. 2008) (per curiam).  Here, there is virtually no such evidence of discriminatory animus on record, and all of Oliveras's "false explanation" evidence, discussed above, is simply not enough to carry the day without it.

Because Oliveras has not established that a rational jury could conclude that his alleged lack of performance was a pretext for age or sex discrimination by Univision, Univision is entitled to summary judgment on the Title VII and ADEA discrimination claims.[15]

## II.    Exhaustion Requirement for Retaliation Claims under Title VII and the ADEA

Univision argues that Oliveras did not file his retaliation claims with the EEOC within 180 days of being discharged.  While the ADU is not designated a Fair Employment Practice Agency under 29 C.F.R. § 1601.74 as to Title VII retaliation claims, this does not mean that such claims are not deemed filed with the EEOC when filed with the ADU.  This question is controlled by the

---

[15] Because the federal discrimination claims are dismissed, it is unnecessary to reach the question of whether they are time barred.

language of the worksharing agreement between the EEOC and ADU.  See Lopez-Machin v. Indupro, 668 F.Supp.2d 320, 325 (D.P.R. 2009) (construing worksharing agreement affecting an administrative claim filed in 2007).  Indeed, it is likely that the worksharing agreement, at least in the past, reached a Title VII retaliation claim submitted to the ADU, as in a prior agreement "the EEOC and the FEPA each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges." Id. (quoting agreement in context of an administrative claim filed in 2007); see also Rodriguez v. Henry Schein, Inc., — F.Supp.2d —, 2011 WL 3441964 (D.P.R. August 8, 2011) (quoting Lopez-Machin and applying same agreement language to claim brought in 2011).  Nonetheless, the worksharing agreement is not before the court in this case.  At the same time, Oliveras argues that the case was filed with the EEOC simultaneously because his ADU charge was marked for forwarding to the EEOC, the ADU's closing letter refers to an EEOC charge number from 2008, and the EEOC right-to-sue letter bears this same charge number.  This is a reasonable inference that raises a genuine issue as to whether the ADU charge was presented to the EEOC on the same date. Therefore, Univision has not demonstrated that it is entitled to summary judgment on the exhaustion question.

## III.    Retaliation under Title VII and the ADEA

Title VII prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3.  The ADEA also prohibits discrimination against an employee for having "opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).

### A.    Direct Evidence of Retaliation

As an alternative to offering circumstantial evidence of discrimination under the *McDonnell*

*Douglas* framework, a plaintiff may attempt to prove unlawful employment practices based on direct evidence that an adverse employment action was taken because of a prohibited animus. See Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 64-65 (1st Cir. 2002) (explaining in context of discrimination claim). Direct evidence includes "[c]omments which, fairly read, demonstrate that a decisionmaker made, or intended to make, employment decisions based on forbidden criteria." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 61 (1st Cir. 2000). On the one hand, the bare possibility of an innocent explanation for the statement does not make it any less direct. Id. However, "inherently ambiguous statements do not qualify as direct evidence." Weston-Smith, 282 F.3d at 65.

Oliveras first opposes summary judgment of his retaliation claims based on the April 10, 2008 letter from Towfighi to Oliveras's attorney, which reads in relevant part:

> As I am sure you are aware, your client, Mr. Gerardo Oliveras, received a disciplinary review on March 31, 2008, during which he was informed that his performance was not meeting Univision's expectations. This was not news to Mr. Oliveras as a similar discussion had taken place with him in May 2007. Now, your client was specifically being given one last opportunity to improve his performance in order to avoid termination. Mr. Oliveras was informed that he had 30 days to demonstrate immediate and sustained improvement. On April 4, 2008, Mr. Oliveras received a memorandum recapping the meeting and the resulting disciplinary action.

> Unfortunately, rather than focus his energy on improving his substandard performance, it appears that Mr. Oliveras has decided on a different approach to try and retain his job: threatening a meritless lawsuit for sex and age discrimination. Given the fact that Mr. Oliveras never complained about discrimination of any kind prior to your letters, and the fact that your letters are bereft of any detailed allegations, it is safe to conclude that there is no basis for a claim. Your letters are obviously designed to either preclude a sizable severance package for your client if he is terminated or to act as a thinly-veiled barrier to termination. I can assure you that they will have neither effect. If Mr. Oliveras does not demonstrate the requested improvement within the allotted time, he will be terminated, and no $700,000 severance package will be offered.

> While the tactic employed by Mr. Oliveras is disturbing, it is not entirely surprising. When faced with the claim of another employee and the challenges her claim presented when it came to termination, Mr. Oliveras remarked to a colleague that he had "learned" something from the process. We now see a misguided attempt at putting this newfound knowledge to use.

> If Mr. Oliveras wishes to withdraw his baseless threat of litigation and simply discuss his departure from the company in a more amicable fashion, I am certainly open to doing so.

(Docket No. 58-12, p. 2–3).  Oliveras characterizes this last paragraph as "illegal per se" (Docket No. 54, p. 19) but cites no authority for that conclusion.  As Univision points out, the fax was a communication between two attorneys regarding a settlement offer.  (Docket No. 69, p. 119–120, ¶ 31).  Oliveras's second conclusion, that the letter "is a directive to Sands, Rodríguez and Reyes to pad Oliveras's personnel [file]" with negative memos is sheer speculation.  No other evidence is offered to show that it was intended, let alone understood, as any kind of directive to Univision.  In sum, no fair reading of this letter implies that Towfighi intended to make an employment decision on forbidden criteria, even assuming that the attorney was a decisionmaker; at best, the phrase "discuss his departure from the company" is ambiguous in context, and not a clear reference to termination.  This letter, therefore, does not raise a genuine issue as to whether Univision acted with retaliatory intent, and will not preclude summary judgment.

More problematic is Rodríguez's April 17, 2008 e-mail, which reads in relevant part:

As was explained to your attorney, your attempts to "save" your job by making false accusations of discrimination will not have the desired effect.  As we explained to you in our meeting and memo, you have serious performance issues that need to be addressed, and you have the remainder of the month in which to address them.  *Instead of focusing on setting up a claim, you should be focused on improving your performance.  If, however, you have no desire to remain employed by Univision, you should continue down this path of not accepting any responsibility for your actions (or lack of action).*  For what it is worth, we would have been thrilled to have you be more involved with your job and your staff, but you choose not to be, forcing us to have direct communications with members of the promotions department.  In addition, direct communication is sometimes necessary due to the press of business – the news does not limit itself to the times that you happen to be in the office and willing and able to work.

Obviously, you have never made any claim of discrimination before, and you have provided no specifics as to what discrimination you have supposedly experienced.  Nevertheless, I am forwarding your e-mail to Jeannette Reyes in Human Resources so she can investigate your accusations.  In the meantime, *I hope you reconsider the path you have chosen and try concentrating on your job duties, rather than your newfound "claim."*

(Docket No. 27-7, p. 26) (emphasis added). Univision argues that this e-mail is not a materially adverse employment action.  (Docket No. 26, p. 31).  Regardless of whether it is actionable, it could, fairly read, demonstrate Rodríguez's intent to make an employment decision based on whether Oliveras maintained his discrimination claim.  Specifically, a reasonable jury could find that

Rodríguez was presenting Oliveras with a forced choice between "improving [his] performance" by "concentrating on [his] job duties," as opposed to "setting up" his "newfound 'claim.'" The statement "I hope you reconsider the path you have chosen and try concentrating on your job duties, rather than your newfound 'claim'" can also fairly be read as indicating an intent to make a decision depending on what Oliveras did with his discrimination claim.

Univision further argues that because the first performance-related meeting on March 31, 2008 predated his threat to file a complaint, that the subsequent performance meetings and memos could not have had retaliatory causation.  (Docket No. 26, p. 33–34).  This argument does not cast doubt on the probative value of Rodríguez's e-mail as evidence of a later-formed retaliatory intent.

Univision's position that Sands was the sole ultimate decisionmaker is also unavaialing. Rodríguez was Oliveras's immediate supervisor, contributed to the performance memos, and was present at the meetings regarding his performance and termination.  There is a reasonable inference that she influenced the decision-making regarding Oliveras's employment, even if Sands had the final word.

Because Oliveras has presented evidence that a reasonable jury could consider to be direct evidence of retaliatory intent, Univision is not entitled to summary judgment on the Title VII and ADEA retaliation claims.  Moreover, the evidence presented by Oliveras also defeats summary judgment when evaluated as circumstantial evidence of retaliation.

### B.        Circumstantial Evidence of Retaliation

A Title VII retaliation plaintiff relying on circumstantial evidence of retaliation bears the burden of establishing a *prima facie* case, to wit: that "(1) he or she engaged in protected activity under Title VII, (2) he or she suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity."  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010) (citation omitted).  For an ADEA claim, the *prima facie* case requires an employee to show "that he engaged in a protected activity, and that he suffered an adverse employment action as a result of his participation in that activity."  See Bennett v. Saint-

Gerardo Oliveras Zapata v. Univision Puerto Rico, Inc.                                    Page 29
CIVIL NO. 09-1987 (BJM)
**OPINION AND ORDER**

Gobain Corp., 507 F.3d 23, 32 (1st Cir. 2007).  This is "a small showing that is not onerous and is easily made."  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003) (citation omitted). The defendant in turn must articulate a legitimate, non-retaliatory reason for the employee's termination.  Collazo, 617 F.3d at 46.  At the third stage, the burden shifts back to the plaintiff to establish that the employer's proffered reason is a pretext for retaliatory animus.  Id.  Because the elements of both ADEA and Title VII retaliation claims are substantially the same and apply the same burden-shifting framework, and because they rely on the same factual predicates in this case, they are considered together.

### 1.       *Prima Facie Case*

An employee engaged in protected conduct if she "either (1) opposed any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII."  Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir. 2009) (citing Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir. 1996)) (internal quotation marks omitted).  Complaints to supervisors, Benoit v. Technical Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003); Bibiloni-Del-Valle v. Puerto Rico, 2011 WL 2746812 (D.P.R. July 13, 2011), and threatening to file a complaint can also be protected opposition.  See EEOC Compliance Manual § 8-II(B)(2) (2006); see also Crawford v. Metro. Gov't of Nashville and Davidson Cnty., 555 U.S. 271, 129 S.Ct. 846, 851 (2009)  (citing same EEOC manual section as guidance for defining "opposition" in retaliation statute).  Here, the March 31, 2008 letter from Oliveras's attorney threatening a discrimination suit, Oliveras's April 4, 2008 e-mail to Rodríguez threatening to file a complaint, and Oliveras's April 15, 2008 e-mail listing grounds for his complaint each satisfy this element of his *prima facie* case.

Adverse employment actions are acts "harmful to the point that they could well dissuade a reasonable worker" from engaging in protected conduct.  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  This "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."  Id. at 71 (internal quotation

**Gerardo Oliveras Zapata v. Univision Puerto Rico, Inc.**                                        Page 30
CIVIL NO. 09-1987 (BJM)
**OPINION AND ORDER**

omitted).  Here, Oliveras cites his termination on August 22, 2008 as the adverse employment action

(Docket No. 54, p. 21) and thus satisfies this element of the case.

As to the third element, the passage of time between protected conduct and dismissal may

undermine an inference of causation.  See Bennett, 507 F.3d at 32.  However, causation may also

be established by other circumstantial evidence.  Che, 342 F.3d at 38.  "Whatever the sources of his

proof, a plaintiff . . . must present evidence from which a reasonable jury could infer that the

employer retaliated against him" for protected activity.  Mesnick, 950 F.2d at 828.

Here, between three and four months passed between each of Oliveras's threats of litigation

and his ultimate termination.  As Univision points out, three and four month periods have been held

too long to establish causation, standing alone.  See Calero-Cerezo, 355 F.3d 6, 25 (1st Cir. 2004).

However, Oliveras does not rely on temporal proximity, inferring causation from other events.  For

the reasons discussed above, the April 17, 2008 Rodríguez e-mail is evidence from which a

reasonable jury could infer causation: Rodríguez characterized Oliveras's claim as being in tension

with an improvement in his performance, a condition of his continued employment.  This is enough

to satisfy Oliveras's *prima facie* burden and shift the burden of production for a non-retaliatory

rationale to Univision.[16]

### 2.      *Non-Discriminatory Reason and Pretext*

The defendant's burden of articulating a legitimate reason is one of production, not

persuasion.  Mariani-Colón, 511 F.3d at 221.  Univision states that its legitimate rationale for

terminating Oliveras was that he performed his job poorly.  (Docket No. 26, p. 35 n. 16).  The burden

---

[16] Oliveras provides other, less adequate theories of causation as well.  Oliveras states he was "repeatedly
singled out for alleged performance deficiencies that were predicated in false statements" without identifying which
incidents he refers to.  (Docket No. 54, p. 23).  This is a conclusion without an adequate evidentiary foundation.  Oliveras
also asserts that he was subject to "increased scrutiny" by Sands, Rodríguez, and Reyes because Reyes's investigation
was a "sham to retaliate against [him]" (Docket No. 54, p. 23).  This likely refers to his conclusion that the investigation
was set up to produce evidence against him because Reyes did not interview him, did not note his alleged noncooperation
with the investigation, and discussed his performance with his subordinates, rather than strictly limiting the investigation
to his claims of discrimination.  (Docket No. 54, p. 15).  This evidence does not itself support the conclusion that he was
being retaliated against.  Nonetheless, the Rodríguez e-mail suffices for the *prima facie* case.

thus returns to Oliveras to show a triable issue as to whether this reason is a pretext for retaliation.

At summary judgment, an employee "need not prove by a preponderance of the additional evidence that [retaliation] was in fact the motive for the action taken. All a plaintiff has to do is raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action." Collazo, 617 F.3d at 50 (brackets in original) (citation and quotation marks omitted).  Such an issue may be raised by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and [with or without the additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons."  Billings v. Town of Grafton, 515 F.3d 39, 55–56 (1st Cir. 2008) (citation and quotation marks omitted).

Oliveras's discussion of pretext for retaliation makes frequent reference to his discussion of pretext for discrimination.  As discussed above, many of these arguments, such as Oliveras's defense of his performance, cast little to no doubt on whether Univision found Oliveras's performance to be poor, let alone that Univision acted because of a prohibited animus.

Oliveras also argues that Reyes's investigation of his discrimination complaint deviated from company policy, and therefore demonstrates that Univision's performance rationale is pretext. Pretext may be demonstrated by showing an employer has deviated inexplicably from a regular business practice.  Kouvchinov, 537 F.3d at 68.  "[W]here an employer's approach to personnel matters is flexible or discretionary, there is by definition no standard practice from which to deviate." Id.  Reyes testified as to her own best practices in investigations: that she attempts to interview a claimant, and should note his refusal to cooperate.  While it is uncontested that Reyes did not ultimately interview Oliveras, this variance is not inexplicable on the uncontested facts: when Reyes sought feedback on the June memo, Oliveras declined to speak in order to consult his attorney, and did not contact Reyes again.  As for the failure to note Oliveras's refusal to cooperate, the evidence of both Univision's policy and Reyes's violation of it comes from Reyes's deposition:

**Gerardo Oliveras Zapata v. Univision Puerto Rico, Inc.**                                                   Page 32
CIVIL NO. 09-1987 (BJM)
**OPINION AND ORDER**

> Q.  And in [Oliveras's personnel file], does a notation of yours appear[] saying that Gerardo Oliveras refused to cooperate with the investigation, is that right that it does not appear?
>
> A.  Nothing appears in writing . . .
>
> Q.  Nothing appears in writing.
>
> A.  . . . here.  No, not in these documents.
>
> Q.  And that would be something important also for an investigation, isn't that right, to document that he did not want to sha... that he did not want to cooperate with the investigation, isn't that right?
>
> A.  Yes.

(Docket No. 67-6, p. 14).  This acknowledgment that documenting non-cooperation would be important "does not hint at, much less establish, a corporate policy or practice of the kind limned by the plaintiff," nor is it "enough to establish a trialworthy issue as to the existence of a policy or practice."  Kouvchinov, 537 F.3d at 69.

Oliveras also cites the April 10, 2008 letter from Towfighi as proof of discriminatory intent.  However, as discussed above, the letter is not itself probative of retaliation; moreover, it does not cast doubt on or raise an inconsistency with Univision's proffered rationale.

Rodríguez's April 17, 2008 e-mail, however, does raise an inconsistency in Univision's performance rationale: fairly read, a rational jury could conclude that Rodríguez considered Oliveras's pursuit of his claim to be in direct tension with whether he could perform his job well.  Sands's retort at the April 4, 2008 follow-up meeting, where he allegedly told Oliveras that he did not need a lawyer, and his subsequent change in demeanor, could also permit the inference that he became hostile to Oliveras because of his claim.  In light of the Rodríguez e-mail, this would permit a rational inference that poor performance was used a pretext for retaliation.  See also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) (discriminatory comments by both decisionmaker and employee's supervisor, taken together, permit rational inference of pretext for discrimination).

Therefore, under both direct and circumstantial evidentiary frameworks, Oliveras has

demonstrated that there is a genuine issue of material fact regarding whether Univision had an intent to retaliate against him for threatening to file an age and sex discrimination claim through his attorney. Univision is therefore not entitled to summary judgment on Oliveras's Title VII and ADEA claims.

## IV.   Claims under Puerto Rico Law

### A.   Retaliation Claims under Law 115 and Law 69

Law 115 prohibits discharge, threats, or discrimination against an employee who offers or attempts to offer testimony or information before a legislative, administrative, or judicial forum in Puerto Rico. 29 L.P.R.A. § 194a(a). To prevail, an employee must first present a prima facie case of (1) participation in a protected activity and (2) adverse employment action. The burden shifts to the employer to "claim and provide a nondiscriminatory legitimate reason for the discharge." Finally, the employee "should demonstrate that the alleged reason provided by the employer was a mere pretext for the discharge." 29 L.P.R.A. § 194a(c). Law 69 also prohibits dismissal or discrimination against an employee who files a complaint, opposes discriminatory practices, or participates in an investigation or suit for discriminatory practices against the employer. 29 L.P.R.A. § 1340.

Oliveras has raised a triable question as to whether Univision's reason for discharging him was a pretext for retaliation, and Univision does not challenge whether Oliveras participated in an activity protected under Law 115, or whether he was terminated subsequent to such activity. Univision is therefore not entitled to summary judgment on these claims. See also Collazo, 617 F.3d at 46 n. 3 (defendant's concession of shared analysis of Title VII and Act 69 retaliation claims obviates need for separate analysis).

### B.   Wrongful Discharge under Law 80

Law 80 "requires employers to compensate employees who are discharged without just cause." Baltodano v. Merck, Sharp & Dohme (I.A.) Corp., 637 F.3d 38, 41–42 (1st Cir. 2011). An employee who establishes that he was discharged shifts the burden of persuasion to the employer to

prove that the discharge was justified.  Id.  Law 80 provides a list of just causes for termination.  29

L.P.R.A. § 185b.

Univision argues it is entitled to summary judgment because its decision was related to the

proper and normal operation of the establishment, and to his performance.  (Docket No. 26).

However, as discussed in connection with his retaliation claims, Oliveras has introduced a triable

issue of fact as to whether he was discharged in retaliation for his threat to bring an age and sex

discrimination claim.  Because this would not be just cause under § 185b, Univision is not entitled

to summary judgment on Oliveras's Law 80 claim.

### C.        Discrimination Claims under Law 100 and Law 69

While Law 100 employs different presumptions and burdens of proof than Title VII or the

ADEA, "the burden of proof on the ultimate issue remains with the plaintiff in both causes of

action."  Rivera Rodríguez v. Sears Roebuck de Puerto Rico, Inc., 432 F.3d 379, 383 n. 2 (1st Cir.

2005).  Where a plaintiff has "adduced no significantly probative evidence that his discharge was

motivated by age," summary judgment on a pendent Law 100 claim is appropriate.  Dávila v. Corp.

de Puerto Rico Para La Difusión Pública, 498 F.3d 9, 18 (1st Cir. 2007).  Law 69 contains a narrower

prohibition of sex discrimination that is already prohibited by Law 100, raising the same ultimate

question of discrimination *vel non*.  See Salgado-Candelario v. Ericsson Caribbean, Inc., 614

F.Supp.2d 151, 176 (D.P.R. 2008) (citing Suárez Ruíz v. Figueroa Colón, 145 D.P.R. 142 (P.R.

1998)).

Oliveras's discrimination claims failed under federal law because none of the evidence

offered at summary judgment raised a question of whether Univision's conduct was motivated by

discrimination.   Oliveras argues that its Law 100 claim survives summary judgment because

Univision bears a burden of persuasion, rather than production, as to its non-discriminatory rationale.

(Docket No. 54, p. 35–36).  However, "the employee must *show*, not only *allege*, that his discharge

was not justified, in order to meet his initial burden under Law 100" and establish a presumption of

discrimination.  Varela Teron v. Banco Santander de Puerto Rico, 257 F.Supp.2d 454, 464 (D.P.R.

**Gerardo Oliveras Zapata v. Univision Puerto Rico, Inc.**                          Page 35
CIVIL NO. 09-1987 (BJM)
**OPINION AND ORDER**

2003).

Although there is a triable question of fact as to whether Oliveras's discharge was unjustified because it may have been motivated by retaliation, this is distinct from a showing of unjust discharge. Oliveras is therefore not entitled to a presumption of discrimination under Law 100. Because Oliveras has not proffered any evidence from which a rational jury could infer age or sex discrimination, Univision is entitled to summary judgment on his Law 100 and Law 69 discrimination claims.

### CONCLUSION

For the reasons described above, defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Plaintiff's claims of discrimination under Title VII, ADEA, Law 69, and Law 100 are **DISMISSED WITH PREJUDICE**. The defendant's motion for summary judgment on the remaining claims of retaliation under Title VII, the ADEA, Law 69, and Law 115, and of wrongful discharge under Law 80, is **DENIED**.


**IT IS SO ORDERED**.

In San Juan, Puerto Rico, this 3rd day of October, 2011.


*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge